217 P.3d 1212

**AMERICAN FAMILY MUTUAL INSURANCE COMPANY, a Wisconsin corporation, Petitioner,**

v.

**The Honorable Larry GRANT, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,**

**Lauren Allo, Real Party in Interest.**

**No. 1 CA–SA 09–0145.**

Court of Appeals of Arizona, Division 1, Department E.

Oct. 8, 2009.

Allen & Lewis P.L.C. by Lynn M. Allen, Bryan M. Folger, Christopher A. Treadway, Phoenix, Attorneys for Petitioner.

Gallagher & Kennedy P.A. by Robert W. Boatman, C. Lincoln Combs, Phoenix, Attorneys for Real Party in Interest.

## OPINION

DOWNIE, Judge.

¶ 1 This case presents issues of first impression regarding the proper scope of discovery into an expert witness's purported bias. American Family Mutual Insurance Company ("American Family") seeks special action review of the superior court's order granting real party in interest Lauren Allo's motion to compel and denying American Family's motion to quash a subpoena duces tecum issued to an expert witness. For the following reasons, we accept jurisdiction, grant relief, and remand for further proceedings in the superior court.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 Allo was involved in an automobile accident with Ariel Hickman on September 20, 2005. She sought medical treatment for knee, elbow, and back pain. In December 2005, Allo had arthroscopic surgery on her left knee. She underwent physical therapy and obtained additional medical care in 2006 and 2007.

¶ 3 Hickman's insurance company tendered its policy limits of $15,000 to Allo. American Family, Allo's insurer, paid Allo $5000 under the medical expense coverage portion of its policy. Allo later submitted an underinsured motorist ("UIM") claim to American Family. She stated that she had incurred roughly $26,000 in medical expenses and $3500 in lost wages and that she continued to have problems arising from accident-related injuries.

¶ 4 American Family's internal evaluations of Allo's UIM claim suggested that the knee surgery and ongoing treatment were due to her weight, past injuries, and arthritis—not the automobile accident with Hickman. American Family retained orthopedic surgeon Jon Zoltan, M.D., to review Allo's claim. Dr. Zoltan determined that Allo had preexisting degenerative joint disease, had sustained prior accident injuries, and had undergone previous surgery on her left knee. Dr. Zoltan opined that Allo's arthroscopic surgery and ongoing treatment were not necessitated by the accident with Hickman.

¶ 5 American Family concluded that the $20,000 Allo had already received was sufficient compensation for her accident-related injuries and therefore denied her UIM claim. In 2008, Allo sued American Family. She alleged that the insurer: (1) breached the terms of the insurance contract by denying UIM benefits; and (2) acted in bad faith by, *inter alia,* retaining Dr. Zoltan to evaluate her claim. Allo claimed American Family knew Dr. Zoltan was biased against personal injury plaintiffs and that he would render opinions adverse to her interests.

¶ 6 During discovery, Allo issued a subpoena duces tecum ("subpoena") to Dr. Zoltan, demanding that he produce extensive documentation. Dr. Zoltan objected to substantial portions of the subpoena, and Allo filed a motion to compel. American Family moved to quash the subpoena and also sought a protective order. Specifically, American Family objected to the following paragraphs of the subpoena: [1]

3. A copy of any and all reports and/or opinion letters prepared by you for any attorney at the Lewis & Allen Law

---

1. Neither Dr. Zoltan nor American Family objected to producing Dr. Zoltan's file regarding Allo's claim, including "documentation reviewed, medical images, medical texts reviewed, opinion letters, notes, dictation, draft opinion letters, invoices, billing ledgers, correspondence, e-mails and memoranda."

510

Firm during the last five years.[2]

4. A copy of any and all reports and/or opinion letters prepared by you for any attorney during the last three years.

5. A copy of any and all reports and/or opinion letters prepared by you for any insurance company during the last three years.

6. A copy of any deposition or trial testimony in your possession for testimony provided during the last five years.

7. A list of cases in which you have testified as an expert at trial or by deposition during the last five years, including the name of the case, the name of the attorney that retained you and the name of the attorney that represented the party whose litigation position was adverse to the person or entity that retained you.[3]

. . . .

9. Financial information for years 2005–present documenting the amount of income attributed to and/or received by you for: 1) expert witness consulting services; 2) consulting services to law firms; 3) physicians services or any other professional service provided by you on your own behalf, on behalf of TOCA or any other medical group. Documents requested in this paragraph could include, but are not limited to, personal tax returns, company tax returns, shareholder statements, accounting ledgers, 1099s or W–2s, and profit sharing documents identifying profit attributable to you and any profit sharing distributions made to you on account of this profit. **Note:** Plaintiff will sign an agreement to limit the use of these materials to litigation of this case and return or destroy all copies of these materials at the conclusion of this case.

10. Copies of any statements, forms or documents in your possession and control evidencing income earned by you from the Lewis & Allen Law Firm during years 2005 to the present.

11. Copies of any statements, forms or documents in your possession or control evidencing income earned by you from any of the following sources during years 2002 to the present:

a. any automobile insurance company;

b. any disability insurance carrier;

c. any workers' compensation insurance carrier; and

d. any law firm in defense of a personal injury, wrongful death or medical malpractice claim.

¶ 7 American Family contended that the subpoena to Dr. Zoltan was overbroad, unduly burdensome, and harassing.[4] In defending the subpoena, Allo argued:

The core of Plaintiff's bad faith complaint is that American Family breached its duty to fairly evaluate the claim and give equal consideration to its insured by sending Ms. Allo to a biased, unfair physician for evalu-

---

**2.** Paragraphs 3, 4, and 5 of the subpoena included a "Note" stating, "Patient names and identifying information must be redacted."

**3.** American Family objected to only a portion of paragraph 7, stating:

Defendants agree to produce testimony lists consistent with the parameters of Fed.R.Civ.P. 26(a)(2)(B)(v), which the doctor presumably keeps in the ordinary course of business. However, Plaintiff's request goes far beyond that parameter to require a testimony list from the past five years and identification of both retaining and adverse attorneys. Plaintiff's motion should be denied and the request should be quashed to the extent it demands more information than Federal Rule 26(a)(2)(B)(v), because it is overbroad and unduly burdensome.

Federal Rule of Civil Procedure 26(a)(2)(B)(v) requires parties to provide "a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition."

**4.** American Family also asserted that the subpoena infringed on the confidentiality accorded medical records and violated the requirements of Arizona Revised Statute ("A.R.S.") section 12–2294.01 (Supp.2008) and the Health Insurance Portability and Accountability Act ("HIPAA"), 45 C.F.R. § 164.512. The record reflects that these concerns were ameliorated by the trial court's order and an agreement between the parties to redact personally identifying information. We thus do not discuss this objection further.

ation of her claim, rather than to an unbiased independent physician.

¶ 8 After oral argument, the superior court ordered Dr. Zoltan to produce: (1) copies of all medical review reports and independent medical examination ("IME") reports "provided to insurance companies or their attorneys" from 2000 to present; and (2) "the financial information requested regarding his total revenues from the insurance industry and their lawyers" from 2000 to present. The court also ruled that "Plaintiff's counsel is entitled to know what the fee was that the doctor received on the respective cases at issue" from 2000 to present. The court limited the required disclosures to "cases arising out of Arizona" and ordered that the information produced could not be disseminated beyond this case.[5]

## DISCUSSION

### 1. Special Action Jurisdiction

 ¶ 9 The decision to accept or reject special action jurisdiction is highly discretionary. *Ariz. Legislative Council v. Howe,* 192 Ariz. 378, 382, ¶ 10, 965 P.2d 770, 774 (1998). A primary consideration is whether the petitioner has an equally plain, speedy and adequate remedy by appeal. *State ex rel. Romley v. Superior Court,* 172 Ariz. 109, 111, 834 P.2d 832, 834 (App.1992); *Escalanti v. Superior Court,* 165 Ariz. 385, 386, 799 P.2d 5, 6 (App.1990). Another relevant factor is whether the petition presents an issue of statewide importance affecting numerous cases. *Lind v. Superior Court,* 191 Ariz. 233, 236, ¶ 10, 954 P.2d 1058, 1061 (App. 1998).

 ¶ 10 Although appellate courts do not "routinely entertain petitions for extraordinary relief on discovery matters," special action jurisdiction may be appropriate because a discovery order is not immediately appealable. *Green v. Nygaard,* 213 Ariz. 460, 462, ¶ 6, 143 P.3d 393, 395 (App.2006) (finding special action jurisdiction appropriate "when the issue involves interpretation or application of civil procedure rules"). *See also State*

*Farm Mut. Auto. Ins. Co. v. Superior Court,* 167 Ariz. 135, 804 P.2d 1323 (App.1991) (accepting special action jurisdiction in bad faith case to review trial court's grant of a motion to compel discovery). Because American Family has no adequate remedy by way of appeal, the question presented is likely to recur, and the matter is one of statewide importance about which superior court judges have disagreed, we accept special action jurisdiction.

### 2. Standard of Review

 ¶ 11 A trial court has broad discretion in resolving discovery disputes. *Brown v. Superior Court,* 137 Ariz. 327, 331, 670 P.2d 725, 729 (1983). Nevertheless, a court abuses its discretion when it commits an error of law in reaching its decision or the record fails to provide "substantial support" for the decision. *State v. Cowles,* 207 Ariz. 8, 9, ¶ 3, 82 P.3d 369, 370 (App.2004).

### 3. Discovery Regarding Witness Bias or Prejudice

¶ 12 Arizona Rule of Civil Procedure ("Rule") 26(b)(1)(A) allows parties to obtain discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. . . ." It is not a basis for objection "that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Ariz. R. Civ. P. 26(b)(1)(A). A trial court may, however, "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Ariz. R. Civ. P. 26(c)(1).

 ¶ 13 Generally, litigants are entitled to present evidence that tends to show bias or prejudice on the part of witnesses, including those who testify as experts. Trial courts regularly instruct jurors to assess witnesses' credibility and to consider any "motive, bias, or prejudice." One such instruction reads:

---

5. Although the superior court's order is not entirely clear on this point, the parties apparently agree that Dr. Zoltan was also ordered to provide

a list of cases in which he testified as an expert for a four-year period. This aspect of the court's order is not at issue in these proceedings.

In deciding the facts of this case, you should consider what testimony to accept, and what to reject, you may accept everything a witness says, or part of it, or none of it.

In evaluating testimony, you should use the tests for accuracy and truthfulness that people use in determining matters of importance in everyday life, including such factors as: the witness' ability to see or hear or know the things to which he/she testified; the quality of his/her memory; the witness' manner while testifying; whether he/she has any motive, bias, or prejudice; whether the witness is contradicted by anything he/she said or wrote before trial, or by other evidence; and the reasonableness of the testimony when considered in the light of the other evidence. Consider all of the evidence in light of reason, common sense, and experience.

Rev. Ariz. Jury Instr. (Civil), at 7 (4th ed.2005).

■■■■ ¶ 14 Beyond the generic relevance of bias evidence, Dr. Zoltan's alleged bias has potential relevance to the substantive merits of Allo's bad faith claim. An insurance company must conduct an "adequate investigation" into an insured's claim for benefits. *See Rawlings v. Apodaca,* 151 Ariz. 149, 156, 726 P.2d 565, 572 (1986). Bad faith may exist if "in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Zilisch v. State Farm Mut. Auto. Ins. Co.,* 196 Ariz. 234, 238, ¶ 23, 995 P.2d 276, 280 (2000).

■■■■ ¶ 15 Our prior decisions have established that an expert's "relations with the hiring party and its counsel" are proper subjects of cross-examination and that the scope of expert cross-examination is "expansive" and "free-ranging." *Emergency Care Dynamics, Ltd. v. Superior Court,* 188 Ariz. 32, 35–37, 932 P.2d 297, 300–01 (App.1997). *Accord Barsema v. Susong,* 156 Ariz. 309, 314,

751 P.2d 969, 974 (1988) (evidence that medical malpractice defense expert was health care insurer's vice president and member of its board of directors was admissible to show possible bias); *Vegodsky v. City of Tucson,* 1 Ariz.App. 102, 107, 399 P.2d 723, 728 (1965) ("Ordinarily, it is proper on cross-examination to bring forth prior connections between the witness and a party in order to show bias. However, this rule is not inflexible. A trial court must always consider the danger of injecting collateral issues into a case.").

■■■ ¶ 16 To develop admissible evidence for trial, Allo must have some latitude in discovering the existence, nature, and scope of any motive, bias, or prejudice by Dr. Zoltan. Such latitude, however, is not unfettered. A party's need for bias-related information must be balanced against competing interests, including the right of witnesses to be free from unduly intrusive or burdensome inquiries and the need to prevent broadranging discovery forays that serve to increase the cost, length, and burden of litigation with little or no corresponding benefit.

### 4. Time Frame for Disclosures

■■■ ¶ 17 One aspect of the superior court's order clearly cannot be sustained. Allo's subpoena directed Dr. Zoltan to produce documents in several categories for specified time periods, ranging from three to five years.[6] For reasons not explained by the record,[7] the court instead ordered Dr. Zoltan to produce documentation "for the period of five years preceding the date of the accident to the present," which means the doctor would have to produce information dating back to 2000, notwithstanding the more limited scope of the subpoena.

¶ 18 There is no basis in the record, let alone "substantial support," for this significantly expanded order. *Cowles,* 207 Ariz. at 9, ¶ 3, 82 P.3d at 370. Although we need not decide the precise outer limits for bias-related discovery, it is difficult to envision circumstances that would support a nine-year span.

---

6. Paragraph 11 of the subpoena falls outside these parameters, requesting documents for a six to seven year period.

7. Indeed, the record suggests the parties were surprised at the trial court's broad iteration of the time frame for disclosure, seeking clarification on this point.

Other courts have endorsed presumptive time frames in the three-year range. *See, e.g., Elkins v. Syken,* 672 So.2d 517, 521 (Fla. 1996) (suggesting three years as a presumptively reasonable period for certain expert disclosures); *Cooper v. Schoffstall,* 588 Pa. 505, 526, 905 A.2d 482, 495 (2006) (approving a three-year period for discovery relating to expert bias). The record here does not support requiring Dr. Zoltan to make disclosures for a nine-year period.

### 5. Pursuing Less Intrusive Discovery

 ¶ 19 When Allo issued the subpoena, it appears she had neither deposed Dr. Zoltan nor sought disclosure of bias-related information from him in other ways. Many jurisdictions require litigants to first pursue less intrusive discovery before resorting to broad demands for information such as the subpoena at issue here. *See, e.g., Elkins,* 672 So.2d at 521–22 (overturning trial court's enforcement of broad subpoena to experts, noting, "[t]he least burdensome route of discovery … was simply not followed."); *Primm v. Isaac,* 127 S.W.3d 630, 638 (Ky.2004) ("As [the claimant] has yet to take Dr. Primm's deposition and question him about the sought-after information, the least burdensome route of discovery was simply not followed."); *Cooper,* 905 A.2d at 495 (holding expert bias discovery "should be of the least burdensome and intrusive kind possible"). *See also State Farm,* 167 Ariz. at 139, 804 P.2d at 1327 (noting less onerous methods of discovery bad faith plaintiff could employ in lieu of the sweeping requests at issue). Such a requirement has both legal and equitable merit.

 ¶ 20 Courts have often recognized that overbroad discovery requests have a chilling effect on would-be experts.[8] *See, e.g., Elkins,* 672 So.2d at 522 ("[A]n overly burdensome, expensive discovery process will cause many qualified experts … to refrain from participating in the process, particularly if they have the perception that the process could invade their personal privacy. To adopt petitioner's arguments could have a chilling effect on the ability to obtain doctors willing to testify and could cause future trials to consist of many days of questioning on the collateral issue of expert bias …."); *Primm,* 127 S.W.3d at 638–39 (concluding "the information sought and the manner in which it has been requested is not only duplicative, but also so burdensome as to create a chilling effect on a litigant's ability to find experts to testify as witnesses"); *Cooper,* 905 A.2d at 494 (recognizing experts have "an interest in being free from unduly intrusive and burdensome litigation obligations" and noting "the broader concern with a potential chilling effect").

¶ 21 Requiring litigants to at least initially pursue less intrusive discovery before resorting to sweeping demands for information respects the competing interests outlined in ¶ 16. It is also consistent with the mandate that the rules of civil procedure, including those relating to discovery, "be construed to secure the just, speedy, and inexpensive determination of every action." Ariz. R. Civ. P. 1.

 ¶ 22 Unlike some jurisdictions, we see no reason to require a party to first take an expert's deposition upon written questions or by oral examination. Ariz. R. Civ. P. 30(a) and 31(a). Instead, discovery methods "may be used in any sequence." Ariz. R. Civ. P. 26(d). In some cases, a subpoena duces tecum may be an appropriate first step in gathering expert bias evidence—especially if the information is needed to prepare for a deposition. It is the breadth of the subpoena at issue here that is problematic, not the mere use of a subpoena duces tecum.

¶ 23 In analyzing the propriety of the subpoena, it is significant that Allo already had substantial information about Dr. Zoltan, his litigation-related work, and his purported bi-

---

**8.** We disagree with Allo that American Family's failure to develop an evidentiary record on this point precludes its consideration. Some discovery objections may require more than a bald assertion of fact. Common sense and logic, however, dictate that experts will be reluctant to participate in the litigation process if they believe wholesale rummaging through their professional and financial affairs will ensue.

ases.[9] She had "obtained a *Trial Reporter Compendium* for Dr. Zoltan for 1998 through 2008, which reveals that in the last ten years Dr. Zoltan had either planned to testify or testified in 87 trials. In those 87 cases, he was retained by defendants 86 times, or 98.85 percent of the time." Allo also possessed copies of interrogatory answers from a different lawsuit where Dr. Zoltan estimated the number of IME's he performed during a three-year period (an average of 122 per year), disclosed the approximate amount of income earned from serving as an expert in personal injury cases for a three-year period (an average of $129,000 per year), and admitted he "generally" conducts IME's at the behest of defendants. Additionally, Allo has copies of transcripts from three depositions given by Dr. Zoltan wherein he provides similar information. Allo has stated she "may use portions of those depositions to impeach Dr. Zoltan on the issue of bias towards defendants."

¶ 24 Inherent in many discovery disputes is a question of degree. Litigants can invariably identify additional discovery that might, in some incremental way, bolster a bias-related attack. There must, however, be some limit, lest civil discovery devolve into a war of attrition and deter qualified experts who might otherwise provide valuable assistance to the trier of fact. *See Mohn v. Hahnemann Med. Coll. and Hosp. of Phila.*, 357 Pa.Super. 173, 179, 515 A.2d 920, 923 (1986) ("There must be, and is, a point beyond which inquiry is/will be held to be prejudicial, too intrusive and only serving to divert the case into collateral matters.").

¶ 25 Defining a bright-line standard for all cases is not practical. We do, however, agree with the observation in *Elkins* that some courts "have gone too far in permitting burdensome inquiry into the financial affairs of physicians, providing information which 'serves only to emphasize in unnecessary detail that which would be apparent to the jury on the simplest cross-examination: that certain doctors are consistently chosen by a particular side ... to testify on its respective behalf.'" *Elkins*, 672 So.2d at 521 (quoting

*LeJeune v. Aikin*, 624 So.2d 788, 789–90 (Fla.Dist.Ct.App.1993) (Schwartz, C.J., concurring)).

¶ 26 We also caution that production of exhaustive financial documentation like that demanded in Allo's subpoena is appropriate only in the most compelling of circumstances, and only after less intrusive means of obtaining bias-related evidence have been explored. *See, e.g., Marron v. Stromstad,* 123 P.3d 992, 999 (Alaska 2005) (denying production of experts' tax records to show they worked mainly for defendants; plaintiff could establish that fact without tax records); *Primm,* 127 S.W.3d at 637 (holding that an expert's financial documents "should not be subject to routine disclosure."); *Wrobleski v. de Lara,* 353 Md. 509, 526, 727 A.2d 930, 938 (1999) (rejecting "the harassment of expert witnesses through a wholesale rummaging of their personal and financial records under the guise of seeking impeachment evidence"); *Stinchcomb v. Mammone,* 166 Ohio App.3d 45, 50–51, ¶¶ 38, 47, 849 N.E.2d 54, 57 (2006) (plaintiff could not obtain IME physician's 1099 tax forms received from defense law firms or insurance companies where doctor provided other evidence that he worked primarily for defense bar); *Olinger v. Curry,* 926 S.W.2d 832, 835 (Tex.App.1996) (requiring expert to produce tax returns "merely to show that he is a 'defense' doctor, particularly when he has admitted that 90% of his work is for defendants, would permit experts ... to be subjected to harassment and might well discourage reputable experts from accepting employment in other cases."). *See also* D.R. Richmond, *Expert Witness Conflicts and Compensation,* 67 Tenn. L.Rev. 909, 944 (2000) ("Discovery directed toward an expert's finances is often intended to harass and intimidate, and it may discourage many experts from testifying regardless of their honesty or qualifications. Therefore, the balance between a party's need for reasonable discovery and an expert's reasonable privacy tips in the expert's favor.")

¶ 27 It is also significant to our decision that, on the record before us, this is not a case of a recalcitrant expert or party who is

---

9. In the reply in support of her motion to compel, Allo said she has "supplied to defense counsel and the Court significant evidence of Dr. Zoltan's bias."

refusing to provide any bias-related information. American Family concedes that Allo may take Dr. Zoltan's deposition "to demonstrate bias, including general inquiry into his involvement in the case; who hired him; his credentials; the compensation paid in this case; the approximate number of examinations and record reviews he has performed in the last year; his dealings, generally, with Allen & Lewis and American Family; the approximate amount of compensation paid for expert services in the last year; the approximate percentage of his practice devoted to litigation based examinations and records reviews; and his knowledge of other cases he testified at deposition or trial during the last four years." Additionally, as noted *supra*, Dr. Zoltan has always been willing to provide information about cases in which he has testified in accordance with Federal Rule of Civil Procedure 26(a)(2)(B)(v).

¶ 28 Although we have no way of knowing the full extent of the doctor's ultimate cooperation, his recognition that Allo is entitled to fairly significant impeachment information suggests that issuing such a broad subpoena as the opening discovery salvo is not warranted. *See, e.g., Primm*, 127 S.W.3d at 638–39 (considering doctor's willingness to disclose some information as factor weighing against compelling production of financial documents "prior to any attempt to obtain the information through a less intrusive, burdensome, and costly means"); *In re Plains Mktg., L.P.*, 195 S.W.3d 780, 782–83 (Tex. App.2006) (considering expert's admission he "derived significant income from medical consulting work for litigation defense firms" in ruling plaintiff's discovery requests were "not narrowly tailored").

¶ 29 We recognize that less intrusive discovery may prove inadequate in a given case. Witnesses, both expert and lay, will sometimes prove evasive or provide information of questionable validity or veracity when responding to less comprehensive requests. Although that scenario is not before us, we note that other courts have encountered little difficulty fashioning appropriate remedies in such cases. *See, e.g., Elkins*, 672 So.2d at 521 ("When it is disclosed or made apparent to the trial court that [an expert] has falsified, misrepresented, or obfuscated the required data, the aggrieved party may move to exclude the witness from testifying or move to strike that witness's testimony and or further, move for the imposition of costs and attorney's fees in gathering the information necessary to expose the miscreant expert."). Moreover, if an expert is uncooperative or untruthful in responding to less demanding discovery requests, a trial court has discretion to permit more comprehensive discovery. *See Primm*, 127 S.W.3d at 639 ("If, after taking the deposition, a party can demonstrate that additional information is necessary to undertake reasonable bias impeachment, it may seek leave of court to take additional discovery.").

### CONCLUSION

¶ 30 We vacate the challenged portions of the superior court's discovery order and remand this matter for further proceedings consistent with this opinion, including an assessment of whether Allo has explored less intrusive discovery and, if so, whether she can demonstrate good cause for more expanded inquiries. The court shall also impose a more reasonable time frame for any disclosures ordered on remand.

CONCURRING: MAURICE PORTLEY, Presiding Judge, and MICHAEL J. BROWN, Judge.